No. 94-363

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IN THE MATTER OF THE ESTATE OF
EVERETT ALMER THIES,

ELEANOR THIES,

     Petitioner/Appellant,

  -v-

BARBARA LOWE, PATTY CORAM and
JOHN THIES,

     Respondents/Respondents.



FILED

SEP 2 1 1995

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Maurice R. Colberg, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

          Virginia A. Bryan, Wright, Tolliver & Guthals,
Billings, Montana

     For Respondents:

          James P. Healow, Sweeney & Healow, Billings, Montana


Submitted on Brief: March 23, 1995

Decided: September 21, 1995

Filed:

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a decision of the Thirteenth Judicial District Court, Yellowstone County, declaring the widow (Petitioner/Eleanor) cannot collect against the will of the decedent (Everett). We affirm.

We restate the issue on appeal. Did the District Court err in determining the prenuptial agreement between Eleanor and Everett was valid, thus, precluding Eleanor from collecting her elective share of Everett's estate?

## Facts

Everett and Eleanor were married June 27, 1981. Both Everett and Eleanor had been married previously. Eleanor had one child by her previous marriage and Everett had three children by his. The parties entered into a prenuptial agreement on June 26, 1981. This agreement was prepared by Everett's attorney (Mr. Gunderson). Eleanor was not represented by counsel in this matter.

The second recital to the prenuptial agreement stated:

> WHEREAS, each of the parties owns individual real and personal property, the nature and extent of the holdings of each party having been fully disclosed to the other; . . .

Following, the first three substantive paragraphs of the prenuptial agreement stated:

> 1. After the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, whether now owned or hereafter acquired, and each of them shall have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made

2

by the other by reason of their marriage and with the same effect, as if no marriage had been consummated between them.

2. Notwithstanding the provisions of the next preceding and next succeeding paragraphs, any real or personal property acquired as joint tenants during their marriage shall, at the death of one of the parties, vest in the survivor of them.

3. Each of the parties waives and releases all rights as surviving spouse in the property or estate of the other and waives the right to elect to take against the other's will, whether heretofore or hereafter made.

Mr. Gunderson testified that he did not discuss the prenuptial agreement with Eleanor prior to its preparation. Mr. Gunderson inquired in the presence of Everett and Eleanor whether they understood the agreement and were aware of the assets of the other. Eleanor recalls that Mr. Gunderson asked Everett and her whether they divulged their assets to each other and that Everett said they had. Eleanor claims they had not divulged their assets and, although she knew it at the time, she remained silent and did not speak up.

Eleanor admits reading the agreement. She testified it was her understanding, at the time, the gist of the agreement was that she would not have a claim to anything which Everett and his first wife had accumulated. Eleanor claims nobody explained to her the nature of what was meant by waiving her elective share of the estate. Mr. Gunderson testified Eleanor said nothing at the time to indicate she was dissatisfied with the agreement, she did not understand what she was signing, she was pressured or coerced into signing it, or it only applied to property accumulated in Everett's prior marriage.

3

At the time of his marriage to Eleanor, Everett owned his home, two cars, personal belongings and a Piper, Jaffray & Hopwood retirement account valued at $143,090. Eleanor had approximately $7,000 of assets. Eleanor said she supposed Everett owned the home he had lived in for nearly forty years, but he had never said so. Additionally, Eleanor testified that she knew Everett had worked at Piper, Jaffray & Hopwood since shortly after World War II but claimed she did not know he had any retirement benefits or savings through his employer. During their marriage, Eleanor said she quit her job as a relator, at Everett's request, and relied on his support.

Eleanor testified, in 1985-86, in response to a comment made by Everett, she consulted an attorney as to the prenuptial agreement and her financial situation. She said her attorney told her she had signed all of her rights away and should ask Everett to provide for her in an irrevocable will. At Eleanor's request, Everett drafted a will devising to Eleanor $10,000 in cash, furniture and household goods, a life estate in the family home and earnings on a bond portfolio that he would maintain in a minimum amount of $100,000 for Eleanor's life. The will provided "[a]s to the bequest to my wife, ELEANOR E. THIES, contained herein, this Will shall be irrevocable so long as we are married and living together."

Eleanor and Everett had marital conflict which resulted in the filing by Eleanor of a petition for dissolution of marriage on June 6, 1991. The couple separated and Eleanor moved to Colorado. On

4

July 9, 1991, Everett prepared a new will disinheriting Eleanor and naming his children as the sole heirs to his estate. Everett died on March 20, 1992. The pending dissolution action was dismissed by reason of Everett's death.

At his death, Everett's Piper Jaffray account was valued at $333,692. Eleanor testified her net worth was under $10,000. Eleanor filed a petition for payment of her elective share on June 19, 1992. A non-jury trial was held on December 21, 1993. The District Court ruled the prenuptial agreement precluded Eleanor from claiming her elective share. Judgment was entered in favor of respondents, Barbara Lowe, Patty Coram and John Thies, on March 30, 1994. From this judgment, Eleanor appeals.

### Discussion

Eleanor argues the prenuptial agreement, signed in 1981, contained an invalid waiver under the governing statute--§ 72-2-102, MCA (1979). Section 72-2-102, MCA (1979), a codification of UPC § 2-204, provides:

> **Waiver of rights by spouse.** The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property, and family allowance or any of them may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the party waiving after fair disclosure. Unless it provides to the contrary, a waiver of "all rights" (or equivalent language) in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation or divorce is a waiver of all rights to elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits which would otherwise pass to him from the other by intestate succession or by virtue of the provisions of any will executed before the waiver or property settlement.

5

[Emphasis added.]

Eleanor contends, prior to signing the prenuptial agreement, Everett did not disclose his assets to her. Therefore, Eleanor claims the agreement is not valid and she did not waive her elective share.

Eleanor refers to our decision in Estate of Flasted (1987), 228 Mont. 85, 741 P.2d 750, where we determined a widow waived her right to an elective share of her husband's estate in an agreement with her brother-in-law. In that case, the widow signed an agreement acknowledging she had rights to the property of the estate as the deceased's widow; she was represented by an experienced attorney who drafted the agreement; and, the brother-in-law was not represented by counsel and was unaware of the widow's statutory rights. Eleanor argues the agreement she signed should be held invalid for the same reasons the widow's agreement, in Flasted, was found valid--Eleanor did not know she had rights to an elective share of the property; she was not represented by counsel; and, it was Everett's attorney who drafted the agreement.

In Flasted, however, the widow's argument was based on the ambiguity of the agreement regarding what rights she was waiving. The agreement's ambiguity was interpreted against the widow because it was her counsel who drafted the agreement. In the divorce proceedings Eleanor initiated prior to Everett's death, Eleanor's counsel stated the prenuptial agreement was "straightforward and simple." Therefore, it's ambiguity is not at issue and the Flasted decision does not apply.

6

Eleanor then refers to Breidenbach v. Wedum (1988), 233 Mont. 478, 760 P.2d 1237, which involves the validity of a family settlement agreement between heirs as a renunciation of the vested rights of a single heir. We held the settlement agreement to be invalid because it did not describe the property or interest, nor did it declare the extent of the renunciation. Eleanor claims her prenuptial agreement lacked the same element--explicit disclosure. Eleanor argues, under Breidenbach, the prenuptial agreement fails.

The heir's rights which were contested in Breidenbach vested at the decedent's death because the heir was the named beneficiary of a life insurance policy and was a joint tenant with the decedent in certain property. The governing statute, § 72-2-101, MCA (1979), specifically required that a writing, in a renunciation of succession, shall "describe the property or part thereof or interest therein renounced." The statute governing the waiver of rights by a spouse, § 72-2-102, MCA (1979), requires only "fair disclosure." Therefore, Breidenbach does not apply as well.

Eleanor asserts we should consider other states' interpretations of fair disclosure under UPC § 2-204. Particularly, the New Jersey Superior Court, in DeLorean v. DeLorean (N.J. 1986), 511 A.2d 1257, prescribed that, henceforth, prenuptial agreements must contain a written document setting forth the assets and liabilities of both parties in order to be enforceable. Eleanor also points to decisions of the Maine and Florida Supreme Courts holding that specific disclosures, along with explicit reference to the statutory rights being waived, are

7

necessary for fair disclosure. Estate of Robert Berzinis (Maine 1986), 505 A.2d 86; Estate of Galluzzo (Maine 1992), 615 A.2d 236, 238; and Oliveira v. Sturm (Fla. App. 3 Dist. 1992), 610 So.2d 108.

While detailing assets and values of each party in the prenuptial agreement or by way of attachment or addendum might make some sense from a drafting standpoint, as doing so would likely render the agreement less subject to challenge, the statute at issue here does not impose such a requirement. Rather, § 72-2-102, MCA (1979), requires only that there be "fair disclosure" before the agreement is entered into. It is not the prerogative of this Court or of the trial court to insert into the statute that which has been omitted or omit that which has been inserted. Section 1-2-101, MCA. While recognizing that other states have resolved this issue differently, we, nevertheless, decline to read into the statute a requirement of explicit or detailed disclosure either as part of the agreement itself or as part of the discussions preceding entry into the agreement since that sort of requirement was not included by the legislature.

Rather, the respondents, Everett's heirs, contend the District Court properly followed the Colorado Supreme Court's reasoning in a nearly identical situation to the case at hand. In re Estate of Lopata (Colo. 1982), 641 P.2d 952. We agree that Lopata represents the better interpretation of the language in § 72-2-102, MCA (1979). Three days before their wedding, a 57-year old woman and a man 10 years her senior, both with children from prior marriages, executed a prenuptial agreement which included a recital of full

8

disclosure and wherein each renounced any interest in the estate of the other. Similar to the facts surrounding Eleanor and Everett's agreement, the husband's attorney drafted the agreement and the wife was not advised by him nor represented by independent counsel. Other than the disclosure recital, there was no evidence that either party disclosed all of his or her assets to the other. The husband's estate exceeded $1 million--approximately 40 times the net value of his wife's estate. Nevertheless, the Colorado Supreme Court upheld the district court's finding that the evidence failed by any standard to establish fraud, concealment, material misrepresentation, or undue influence by the husband at the time the prenuptial contract was entered into. Lopata, 641 P.2d at 956. Under the facts of that case, the court concluded, though the disclosure of the husband's assets to his wife was general, it was entirely fair.

The District Court acknowledged that a number of other states take a fairly stringent view concerning the extent of disclosure required to constitute fair disclosure. The court stated the best procedure would obviously be to insert in the prenuptial agreement the disclosure of assets and values between the parties. However, the court believed the Colorado Supreme Court enunciated the better view of fair disclosure when it stated the following:

> Fair disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other. Each party has a duty to consider and evaluate the information received before signing an agreement since they are not assumed to have lost their judgmental faculties because of their pending marriage.

9

Lopata, 641 P.2d at 955.

The District Court noted, since Everett was deceased, Eleanor was the only witness available who could testify to the actual discussions between she and Everett concerning their assets. The court, as the trier of fact, found Eleanor's testimony involving Everett's disclosure and her general knowledge of Everett's worth not particularly credible. "The credibility of witnesses and the weight to be assigned to their testimony are to be determined by the trier of fact, and disputed question of fact and credibility will not be disturbed on appeal [citation omitted]." State v. Moreno (1990), 241 Mont. 359, 361, 787 P.2d 334, 336.

In considering what Eleanor claimed she knew, what was placed in evidence by her own witness, and the recitation in the prenuptial agreement that the parties had made a full disclosure of their assets, the District Court found "Eleanor at least in general terms knew that Everett had a residence, two cars, the personal belongings in the residence and some retirement or savings account through his employer Piper, Jaffray & Hopwood." The District Court concluded "there was at least a general disclosure of the assets and income capacity of Everett prior to marriage which would constitute a 'fair disclosure' under Section 72-2-10[2], MCA." We also note Eleanor acknowledged in the written agreement that "the nature and extent of the holdings of each party [were] fully disclosed to the other."

Whether there was fair disclosure of Everett's assets prior to the parties' execution of the prenuptial agreement was a factual

10

determination to be made by the District Court. We review a district court's finding of fact to determine if the findings are clearly erroneous. Columbia Grain International v. Cereck (1993), 258 Mont. 414, 417, 852 P.2d 676, 678. To make a clearly erroneous determination, we apply the three-part test adopted in Interstate Production Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 322-23, 820 P.2d 1285, 1287.

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. [Citations omitted] Third, if substantial evidence exists and the effect of the evidence as not been misapprehended, the Court may still find that '[A] finding is "clearly erroneous" when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." U.S. v. U.S. Gypsum Co. (1948), 333 U.S. 364, 68 S.Ct. 525, 92 L.Wd. 746.

We have reviewed the record and, in light of the District Court's determination that Eleanor lacked credibility, we conclude substantial evidence exists to support the District Court's finding of general disclosure on the part of Everett to Eleanor. We further conclude this evidence has not been misapprehended nor has a mistake been committed.

Although, here, disclosure was not detailed, we agree with the District Court's conclusion that the requirements of § 72-2-102, MCA (1979)--in particular, fair disclosure--were complied with under the facts of this case. In making this determination, the District Court properly relied on Lopata, 641 P.2d at 955-56, which was directly on point both factually and legally.

11

As the Dissent points out, and as we also point out above, this case could have easily been avoided if the parties had included a list of their assets and values in the agreement. The fact is, however, they did not and there is nothing in § 72-2-102, MCA, that requires a list--a point that the Dissent fails to acknowledge. With no support in the record, save Eleanor's self-serving testimony which the trial judge found not credible, the Dissent presumes that Everett did not fairly disclose his assets and values to her and, apparently, in some unexplained way took advantage of her lack of business acumen. There is simply no basis for such a presumption. Eleanor signed an agreement in which she, in writing, acknowledged that there had been full disclosure. While she now claims she knew at the time that there was not full disclosure, she nevertheless also admits that she did not speak up when Everett stated to Mr. Gunderson that there had been full disclosure. She voluntarily signed the agreement that was presented to her. There is nothing in the record that indicates Eleanor was forced to sign the agreement, that she requested more time to consider and study the agreement or that she was precluded from retaining her own counsel to review the agreement and advise her of the consequences of signing it. She admits that she learned of the nature of what she had given up under the agreement while Everett was still alive, yet she took no legal action to set the agreement aside or challenge it, until after Everett's death. There is nothing in the record that indicates that, assuming arguendo, there was not fair disclosure, that Eleanor tried to get more information about Everett's estate or that she even inquired

12

further of him in that regard before signing the agreement.

In short, while criticizing the result of our opinion as creating a duty between potential spouses to question each other about their assets (the very duty that § 72-2-102, MCA, seems to contemplate), the Dissent's position ignores the statute and, rather, attempts to justify Eleanor for failing to demand fair disclosure when, according to her, she knew it had not been made; for knowingly concurring with the misrepresentation of fair disclosure in the written agreement; and, finally, for attempting to take advantage of her own misconduct at a time when Everett is no longer alive to defend himself or his estate. That approach is not supportable on the facts here, as a matter of law or in basic fairness.

Finally, Eleanor argues the applicability of the Uniform Prenuptial Agreement Act adopted by Montana in 1987. We note the act was not in force at the time this prenuptial agreement was entered into, and Eleanor has not cited us to any authority that would require us to apply the act. Without deciding whether or not the act does apply, based upon the facts of this case and the District Court's findings, its application would not change the result here in any event.

We hold the District Court did not err in determining the prenuptial agreement between Eleanor and Everett was valid, thus, precluding Eleanor from collecting her elective share of Everett's estate. We affirm.

_____
Justice

We Concur:

_Karla M. Gray_

_William E. Hunt_

_Terry Trieweiler_
_____
Justices

Justice W. William Leaphart, dissenting.

I dissent from the majority opinion which, with no evidence that there was actually a disclosure of assets, finds "fair disclosure." With this decision, Montana takes a step beyond other jurisdictions in upholding a prenuptial agreement based on a mere recitation of disclosure. This case has none of the circumstances and background that have led other courts to find "general disclosure" based on a recitation of disclosure satisfactory. In so deciding, we establish a policy of inquiry rather than disclosure--we create a duty to question future spouses about their assets and forthrightness, rather than imposing a duty to openly and honestly disclose information to a future spouse.

The dispute in this case could easily have been avoided if the parties had included a list of their assets and values in the prenuptial agreement. However, Eleanor and Everett's prenuptial agreement contains only a recital of disclosure with no attached list of assets or values. Even though Eleanor had only dated Everett for six months, the District Court concluded that she must have known that he owned his house and had a substantial retirement fund. Based upon these unfounded assumptions, the court concludes that a bare recitation of disclosure constitutes "fair disclosure" under § 72-2-102, MCA. However, in reviewing the facts of the case, there is nothing to support the District Court's finding that Eleanor had a general knowledge of Everett's assets.

Eleanor testified that Everett did not disclose his assets to her before signing the prenuptial agreement. The agreement was

15

prepared by Everett's attorney Mr. Gunderson. Mr. Gunderson testified that at the fifteen minute meeting to discuss and sign the prenuptial agreement, neither he nor Everett disclosed Everett's assets with Eleanor. Eleanor was not represented by counsel, nor had she seen or read the agreement before the meeting. Eleanor testified that the rights she waived in the prenuptial agreement were not explained to her by Gunderson or Everett. Understandably, she did not comprehend the rights she waived as neither the elective share nor allowances are easily or commonly understood principles. Eleanor had known Everett only six months before she signed the prenuptial agreement the day before she and Everett were married. There is no indication that Eleanor had any independent source of information regarding Everett's assets. Eleanor had no independent knowledge of Everett's employment or the intricacies of his employer's retirement plans.

Eleanor's education and experience did not provide her with a background in business and investment affairs. She did not complete high school. She has never made more than $5,000 a year. Her employment history as a realtor did not justify the District Court's assumption that she must have known about Everett's retirement fund. Even if, as the District Court assumed, she knew that Everett owned his home and had a retirement fund, there is no way she could have had any idea of their values without some disclosure by Everett. The house could have been heavily mortgaged and his retirement fund could have been worth anywhere from a few thousand to several hundred thousand dollars.

16

Based on these facts, the District Court's conclusion that "there was at least a general disclosure of the assets and income capacity of Everett prior to marriage which would constitute a 'fair disclosure' under Section 72-2-103 MCA," is not supported by substantial evidence. The District Court, in finding it "inconceivable" that Eleanor did not know that Everett owned his home and that she must have, or should have known, that as a stockbroker for several decades Everett would have a retirement fund, imposes on Eleanor a level of knowledge that is not supported by the evidence, her background or education. In agreeing with this assumption, this Court imposes a requirement that everyone on the threshold of signing a prenuptial agreement have a thorough understanding of professional upper middle class financial planning. In this world of economic and cultural diversity, this is an unreasonable imposition.

The Court errs in affirming that there was a general disclosure of assets, when it is clear from the record there was no disclosure, general or otherwise. Rather, the record reveals nothing more than an unfulfilled recital of disclosure and the District Court's unreasonable assumption that Eleanor should have known as a matter of general knowledge, that Everett had a retirement fund of unknown value.

In Schumacher v. Schumacher (Wis. 1986), 388 N.W.2d 912, 915, the Wisconsin Supreme Court pointed out that, when the parties to a prenuptial agreement do not fairly and reasonably disclose their actual assets to one another, independent knowledge of one

another's financial status may substitute for fair and reasonable disclosure. Nonetheless, such independent knowledge must be more than a general knowledge of the other's assets and their value. As an illustration, the court stated that if one party surmises that the other has a pension, that conjecture is not the equivalent of knowing that the other party has both a pension and an annuity plan with a total value in excess of $60,000. Only actual knowledge of these facts, the court emphasized, will suffice.

Montana is now alone in holding that the test of "fair disclosure" can be satisfied with a mere recitation of disclosure in the absence of any financial information from independent sources or other mitigating circumstances. Most courts agree, the disclosure of assets necessary to validate a prenuptial agreement can be general and need not be an exact detailed disclosure. However, disclosure *does* need to approximate the parties' net worth so that they can make an intelligent decision regarding the agreement. See, e.g. Nanini v. Nanini (Ariz. Ct. App. 1990), 802 P.2d 438; Friedlander v. Friedlander (Wash. 1972), 494 P.2d 208; Laird v. Laird (Wyo. 1979), 597 P.2d 463. In fact, the case relied on by this Court, the District Court, and Everett's children, In re Estate of Lopata (Colo. 1982), 641 P.2d 952, 955, states: "Fair disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other." Yet in the instant case, there is no indication that Everett provided any financial information to Eleanor. Rather, the Court has required her to glean this

18

information through her intuition or perhaps through osmosis. Generally speaking, a written disclosure will be the more reliable method.

In Lopata, the court looked at the education, background, and business experience of Mrs. Lopata and found that she was "well versed in day-to-day business affairs and was accustomed to consulting professionals in matters of law, tax, and accounting." 641 P.2d at 954. Mrs. Lopata had one year of college education, had operated a retail business, participated in an investment club, had her income tax returns professionally prepared, and she had been the administrator of her first husband's estate. Lopata, 641 P.2d at 954. The court also recognized that adequate provision for her support had been made by the prenuptial agreement and weighed the fairness of that provision in upholding the prenuptial agreement. These circumstances are not present in the instant case. Eleanor's background is not comparable to Mrs. Lopata's and if the prenuptial agreement stands, Eleanor gets no support at all from Everett's estate.

In Lopata, the wife's testimony regarding disclosure was barred under Colorado's dead man statute. Lopata, 641 P.2d at 956. Although Montana does not have a dead man statute, the District Court, nonetheless, found that Eleanor's testimony was not particularly credible because she was the only witness still alive. The irony, of course, is that if there were a written disclosure, the parties and the court would not be put in the position of presenting or relying upon self serving testimony. Under this

19

Court's holding herein, such disputes will necessarily be resolved through after the fact credibility battles rather than contemporaneous documentation. As it is, Eleanor testified that there was no disclosure and her testimony rebuts any presumption that adheres to the agreement's bare recitation of disclosure.

The District Court faults Eleanor for conceding in an earlier dissolution proceeding, that the prenuptial agreement was "straightforward and simple." This Court also finds this concession persuasive in holding that the agreement was not ambiguous. I agree that there was no ambiguity in what the agreement did provide. As Eleanor's attorney admitted, the agreement straightforwardly applied in the event of death, not dissolution. The problem presented here, however, pertains not to what the agreement says, but rather, what it does not say. It does not say what assets and values are being disclosed.

In sum, our decision applies none of the criteria other courts have considered in determining whether the spouse knew or should have known of the other's assets, i.e.: a previous business relationship (In re Marriage of Knoll (Or. Ct. App. 1983), 671 P.2d 718; Pajak v. Pajak (W. Va. 1989), 385 S.E.2d 384); evidence of oral disclosure (In re Estate of Hill (Neb. 1983), 335 N.W.2d 750; In re Estate of Hartman (Pa. Super. Ct. 1990), 582 A.2d 648); knowing the person for more than two years before signing an agreement (In re Estate of Stever (Colo. 1964), 392 P.2d 286; In re Parish's Estate (Iowa 1945), 20 N.W.2d 32; In re Neis' Estate (Kan. 1950), 225 P.2d 110; Laird, 597 P.2d 463); or living near each

20

other (In re Estate of Broadie (Kan. 1972), 493 P.2d 289; In re Estate of Youngblood (Mo. 1970), 457 S.W.2d 750). Instead, this Court does as no other court has chosen to do. It assumes that a person of limited financial expertise who has known the other party for a mere six months, who has no background in estate matters, is unrepresented by counsel and who has fifteen minutes to read and question the premarital agreement before signing it the day before the wedding, has sufficient knowledge and information to satisfy the requirements of "fair disclosure."

As we and the District Court recognize, the issue presented by this case could have been easily solved by including a list of assets and their values in the prenuptial agreement. Such a list ensures disclosure and eliminates the sort of testimony presently confronting us. Without a written list, we must weigh testimony which recalls events from 1981, is self-serving, and only arises upon the death of one of the parties insuring the absence of the deceased party's testimony. Clearly the preferable policy is to encourage the benedicts of the world to actually disclose their assets and thereby avoid unseemly postmortem battles as to what was or was not disclosed on the threshold of marriage. This Court, however, sends the clear message that an intended spouse, when asked "Have you disclosed all of your finances and assets?" can keep his fingers crossed while responding in the affirmative.

The Court's holding opens the door to hiding assets from a future spouse. Instead of requiring actual and voluntary disclosure, this holding will require that prospective spouses

21

investigate and inquire as to their future spouse's financial affairs and holdings. In many instances, the less affluent spouse will not have the sophistication or know-how to make the appropriate inquiries. He/she will thus be left at the mercy of the other spouse's paying lip service to "fair disclosure" § 72-2-102, MCA, a legal requirement which we have effectively reduced to voluntary compliance.

_____
Justice